Week. Lots of oral arguments to hear. I will say the pandemic has not slowed us down. So we've been moving and grooving even in zoom. But it's good to be back in person and have counsel here. I'm honored to say the least to have be sitting with Judge Patrick Higginbotham. Esteemed judge was on this court when I was practicing law. We're glad to have him and have my colleague Judge Wilson from Mississippi. So we've got the circuit covered. We've got Texas over here, Louisiana in the middle and Mississippi here. So whichever way you come in, we got you covered this morning. So welcome. So we look forward to you all are veterans. You know the rules. The main thing is just to speak up into the mic so that we can capture you on tape. We do listen to the recordings both for purposes of opinions and so forth. But in this environment, there are others who listen. So as long as you stay in the go. All right. First case up number 20-40040 United States versus Vargas and Vargas. Miss Ola, you're up, ma'am. I always wonder about these time divisions, these slices. So you got your work covered to get what you need in eight minutes. But let's see. Good morning. May it please the court. My name is Rebecca Ola. I'm here today representing Joel Vargas in his appeal of his conviction for two counts of transporting stolen tires from the state of Texas to Mexico. One count of conspiracy to transport stolen tires in interstate commerce and one count of tampering with the witness. I will be discussing two of the claims raised in my brief today. First, the constructive amendments that occurred in counts one, two and three. And second, the sufficiency of the evidence specifically for count four, where the government failed to show that a federal proceeding was foreseeable under the nexus requirement for 18 U. S. C. 1512. Let me ask you a quick question. Ordinarily, you know, we get these constructive amendment issues that tend to come up with respect to the indictment. And so it's kind of early on in motion eliminate, you know, that are not about constructive indictments. So I was curious with this. The constructive indictment, you know, sort of finds it permeates this way later. So quickly, I take it this didn't come up in the indictment stage, etcetera. It's just with respect to the argument made here about the evidence that it so there's no complaint about the jury instruction given to the jury vis a vis was here, right? I mean, no, like, Hey, your honor, the indictments been constructively amended. Jury needs instruction here. Here. None of that, right? All right. So we just have it down this main highway, right? Okay. Just wanna be clear. Keep going. So for constructive amendments when it was not raised at trial, the standard of review review is for plain error. So there has to be an error. It has to be clear and obvious, and it had to affect defendants substantial rights. But it wasn't clear and obvious to raise it before now. I keep going. It's a rhetorical question. So the Fifth Amendment to the Constitution states that no person shall be held to answer for a capital or otherwise infamous crime unless on indictment of a grand jury. This provision guarantees criminal defendants a right to be tried solely on the allegations in the in an indictment returned by the grand jury. Once the it occurs when a constructive amendment occurs when it permits the defendant to be convicted upon a factual basis, you're gonna run out of time. We know what it is. You better get to the meat of your argument. Yes, Your Honor. The particular predicate for jurisdiction is an essential element of any federal offense. And when there's alternate bases of jurisdiction, a defendant's conviction commerce in the foreign commerce, right? Come on. I'm trying to help you with the answer. But yes, so now you're doing good. If you're nervous, we good. Judge Wilson and Judge Higginbottom, they're gonna be tame. Okay, so go for it. All right. And counts one and two. Joel Vargas was indicted for transporting stolen tires, and the indictment said in interstate commerce from the state of Texas to Mexico. Now, in its responsive brief, the government conceded that that those words mean commerce from Texas to Mexico, which is foreign commerce. So that's the indictment. But when the court instructed the jury, they were told they could he could be found guilty if they found that he transported tires in interstate or foreign commerce. So they were given both options. And what's your best case on what we have here? You know, not pretrial. But I mean, what's your best case? Just zinging it to say government goofed, you know, turns away. They did it. And what's your goose case to say? You know, we have to reverse because even though it's plain air, we're talking about a legal issue, right? What's your best case? Um, so Sterone says reversal is required if it's raised. But when it's not, um, then you have the option. You have discretion. Uh huh. So what? So let's look at this from another way. What do you do with United States versus Young? The other cases that say that interstate are interstate and foreign commerce. It's a unitary concert concept. In other words, doesn't that support then our case law support that that's it's a variance in the indictment, not a constructive amendment. Well, the distinction between that case and this is that the definition section in Young defined interstate or and foreign commerce as a single unitary concept. But that's not the case here. The definition section here defines them as separate and distinct. So we're going by the definitional framework under this particular statute. In those cases, we just we set that general proposition aside. That was the reasoning in Young was this is mere variance because it was defined as a single unitary concept. So, um, that wasn't the case here. It's not a single unitary concept. Is there any case law that supports that position? Um, yes. U. S. V. McCrary says that, um, when there's alternative basis of jurisdiction, a defendant's conviction cannot rest upon a basis of jurisdiction. So that's the definition of the statute. But that's not the  that's a different from that charged in the indictment. But with regard to this particular statute stating that the definitions are, as you say, that they're not a unitary concept, that they're separate and distinct. Is your position that that's apparent from the statute? That's apparent from the evidence is gonna be different. Well, that's a different proposition. You may you may well be that the least with joy of the evidence of foreign exports to Mexico is very sparse. Indeed, it may be inadequate to him. But the concept of commerce, the indexes, the jurisdiction of the court, federal courts and commerce is functioning conceptually. Commerce, albeit foreign, albeit domestic interstate. Uh, I understand. Um, and I think that, uh, to give, um, McCrary and U. S. V. Patrick, they're specifying if there's these different options for jurisdiction, you do actually have to limit yourself in these instructions to the jury on the basis that was put forth in the indictment. Well, that's what I started with. You're saying it's plain, but it wasn't plain enough. The council asked for a jury instruction. I mean, that's instruction. Pattern charge is designed to steer the jury in the direction that the evidence, you know, so indicates. I mean, that's the time. Not that you can't raise it later, but I mean, to perfect it would be so the jury, you know, can sit it out. So on the one hand, say it's plain error. But on the other hand, it wasn't plain or clear enough to warrant, you know, to the jury to steer through the other. Anyway, that's you, you know, you've I mean, we have your point. So you feel like young is distinguishable. And well, you acknowledge that if it was raised to Ron, it's your best case. Otherwise, if I remember you saying quote, it's up to our discretion. Close quote. Is that what you say? Right. Well, to give effect to the plain error standard anytime, anytime you have that they didn't notice that what you're doing is you're going to the third or fourth prong. And I'm trying to be clear about how we get past the first prong. There has to be clear and plain. You can't get to the other ones till you get to that. So I'm trying to understand what's triggering the plainness, the clearness of the air. You see what I'm saying? If it's not so clear that it's not raised to the judge, not raised to the jury and evident. But yet you say, well, it's up to us to exercise discretion. But we can never get to discretionary prong unless the air is clear and prone. You see where I'm headed? I do. And I think that, um, in this case, the clear error is that you can look at the indictment and see that it specifies and counts one and two. That's the that's the clearness. You're saying the area is patent on the indictment. Is that what you're trying to say? That's what I'm saying. And I will send you to rebuttal with this that patency of the era here gets you to home plate. You got me? I'm just saying. So if you're arguing that the clearness is based on the patency, the patent nature of the indictment, you say the government concedes and we're gonna ask him when he comes up. They don't like the C word concedes. The government tends not to like that word. So but we'll see that if that gets you made. That's what I'm saying. So when you come up, just answer. Does any acknowledgement they've made help the proposition you're making in terms of getting it? You see what I mean? Yes. All right. But you preserve your rebuttal time. Thank you for answering the court's court's question. All right, Mr Ross. Good morning. May it please the court. Kevin Ross. I represent Angelica Vargas. The question in this case is really the sufficiency of the evidence as to count three of the indictment in regards to conspiracy to transport stolen goods in interstate commerce. Miss Vargas was a very peripheral player in this conspiracy. Wrong place. Wrong time. There was a little bit more to that, Your Honor. However, the question really centers around whether or not her husband, Joel Vargas, was still involved in a conspiracy or an agreement with Arthur Vargas. Now, they're brothers. But in August or September of 2017, it's undisputed that they had an argument and a falling out between the two. And they both went their separate ways. And they had their separate crews in which they would still engage in the business of theft of tires. This is a jury question. You know, this was tried to a jury. We love juries. This is not summary judgment. It's not pre trial. Went to a jury charged by the Fifth Circuit patterns. No deviation. Jury gets to sift through the parts that out. I'll be willing to surmise that the argument you're making now was made the closing made to the jury, etcetera, etcetera. So having said that, as you are in sufficiency, how do we as the Fifth Circuit parse and find error? I think that you look at the facts of the case very closely, even though the standard that the court will use is let's look at the evidence and like most favorable to the jury, most favorable to the verdict, most if you look at the evidence, the evidence does not support the conviction. It simply doesn't. And the reason it doesn't is because if there is no agreement between Joel and Arthur Vargas anymore, there is no conspiracy between the two. If there's no conspiracy between the two that argued to the jury, believe it was your honor. But the reason that we have an appellate court is to look at the not to reweigh the evidence. We're not reweighing the evidence, your honor. We're looking at the evidence in the light of the law. Well, we're looking at the evidence of light, most favorable to the verdict. Last time I looked, you know it, right? So I'm saying I know what you want us to do. I'm just trying to be clear on what our role is, right? Understood, your honor. But when there's a sufficiency argument, even though you look at most favorable into the light of the verdict, I still think that the reviewing court has the opportunity to look at the facts of the case and to weigh the law. But if we conclude that the evidence was sufficient, that there is a conspiracy, a single conspiracy as of December of 2017, your client loses, right? Correct. If there is a single conspiracy, then my client loses because the agreement that she has in regards to her association with Joel Vargas, if those aren't separated out, then she does become involved in the overall conspiracy. What do you do with the testimony from not the Vargases, but the actual crew members who said, oh, it was still one organization even then? Well, I think that if you look at that in the record closely, what leads up to the question, I think that in the government's brief, what leads up to the question of, okay, so y'all were just kind of a big group then, right? I mean, that question. But the evidence, the testimony leading up to that was, well, at first, when they split up, Arthur and Joel, at first it was me, Fonzie, and Arthur. And then maybe like after a little bit of time, Fonzie went back to work with Joel and Ben started working with us. But what we clearly have here from the testimony is that they had split up, that they had gone their separate ways, that there was no longer an agreement of concerted action between Joel and Arthur. The jury was given no instructions with regard to withdrawal of a conspiracy. That's correct, Your Honor. I assume that's because none were requested. That's probably true. They burdened him extraordinarily on a withdrawal situation upon the defendant. Once he's been in the conspiracy, then if there's nothing else, then he's in the conspiracy. And what you have then is not just a failure to object to submission from the charge. You have nothing to support the basis for withdrawal. How do you answer that? Well, I think that to answer that, Your Honor, it becomes a question of, I think what the, it seems like what the trial attorneys tried to establish is that there was no longer a conspiracy anymore. And so the question of withdrawal, even though, you know, the case law says you have to take an affirmative action, you have to make sure that everybody knows that you're not, oftentimes you see that when you're not wanting to engage in the criminal activity anymore. Right? I'm withdrawing. I no longer want to be responsible for what you guys are doing. What's interesting in this case, though, and I think what the testimony bears out, is because there was this disagreement, there was this argument, there was this falling out, you almost have to where they are clear, Joel and Arthur, that they are no longer going to participate together. There's no planning together, there's no participation in staking anything out, there's no sharing of proceeds. But what you really get to is, in this particular case, the government sought, or the investigation sought to create a federal nexus. And that's why they set up Arthur Vargas with his crew to transport the tires from Louisiana to Texas. Unbeknownst to Joel Vargas and his crew, and Angelica Vargas. Now that occurred in January of 2018. The argument in the falling out between Joel Vargas and Arthur Vargas occurred in August-September of 2017. So quite a long period of time in which the two were not talking, the two were not planning, the two were not engaged in a conspiracy or an agreement of concerted action for the unlawful activity at that time. What is the record evidence of that? That they broke their falling out and it continued? What witness testimony do I look to? Well, Your Honor, there is testimony, I believe, by three witnesses. Mr. Hawley, Mr. Ybarra, all testified as to the argument in the falling out in various various places. Throughout the record, it was decided in the briefing. They were brothers, I mean, so that's... Well, I think the difference, though, they were brothers, but it might even heighten the argument because if they're brothers and they had a falling out, they are no longer communicating or talking with each other, which shows a clear distinction in that they no longer are agreeing with each other for concerted activity. I'm asking to you that their brother has a very strong connection between, offers a very strong connection between the two of them, more relative to two people who are totally unrelated in a business enterprise. The withdrawal, I'm just suggesting to you, the absence of withdrawal evidence and an instruction of the jury about it seems to me very difficult for you. Whether there's a joy to that, to the actual transport into Mexico is a different issue, one of the counts, but if he's a participant in the conspiracy and there is sufficient access to Mexico, then he's stuck with that, too. Understood, Your Honor, and I see that my time is up. You can answer if you want. The red light never saves you from answering the court's questions. No, I just was being respectful of the court, Your Honor. I got it. Counsel, that's why we're here. We got plenty of time. If you don't want to answer, that's okay, too. Your Honor, I understand, I think I understand your question. However, I would just rest on the fact that the evidence and the testimony supports that there is a break in the withdrawal. It was unfortunate that that request for a jury instruction was not in the jury instructions. However, looking at the case, looking at the evidence, I think it's clear that there is a withdrawal. It's clear that they went their separate ways. Their testimony is sufficient to show that they went their separate ways, had no further planning and participation, and therefore, Angelica Vargas, who's associated only with Joel Vargas, should have her case and her conviction reversed and judgment of acquittal entered. Thank you. All right. Thank you, Mr. Ross. I appreciate your argument. You've saved some rebuttal time. Mr. Anderson? May it please the court, Michael Anderson, on behalf of the United States government. The court's aware this is a case involving an organization that for the better part of 10 years was stealing tires from hundreds of stores across Texas and was trafficking these tires, both to entities in Texas and across the border to Mexico. Now, cutting straight to the point that the court had alluded to with regard to the constructive defect in this case, the government's not conceding that with regard to the indictment it's an error. I said you didn't like that C word. I know, but what I will agree with is at most it's a variance and it is unartfully drafted. There's no dispute about that. I assume you didn't draft it. I didn't draft it, but I'm not hiding behind it. I represent the United States government, not hiding behind it. We love the government to come in with hands up and say I'm here representing the United States. That said, when we look at counts one and two, if you took the average person on the street, reasonable person off the street, you take any juror member we had, you take anybody that was in the courtroom for this trial, they would have understood that with count one and count two we were talking about tires that were being trafficked to Mexico. What was the evidence that supported that? Early on in the conspiracy, Michael Lopez talked about how he had interactions with an individual he called the Mexican. And the Mexican would buy 18 to 20 tires at a time and told them that these tires were being trafficked to Mexico. Later on in the conspiracy, you have Barky Hawley talking about an individual that they would traffic tires to by the name of Carlos. Carlos made clear to them that these tires were being trafficked to Mexico. That was his understanding. The jury, in listening to that, came to the conclusion that they were satisfied that these tires were being trafficked to Mexico. There was no evidence with regard to count one and count two that there were, and when I say that I mean prior to 2018, that there were any interstate trafficking of tires. None. No evidence. So the only thing with regard to count one and count two that the jury could have based its decision on is the evidence it heard about Mexico. And that mirrors what we have in the indictment. Now, when we come to count three, count three is different because it expands the date to January of 2018. And that's intentional because now we're talking about the reverse sting operation in Louisiana. Now, I'm not going to go into that because there's no dispute about what happened in that reverse sting, but as we apply to the jurisdictional element, and we apply that to the conspiracy involving both defendants in this case, here we have a situation in which we have, as Danielle Ibarra told the jury, a big group. A big group who, yes, admittedly, they had a falling out. They had an argument. Brothers have arguments from time to time. However, they were still a big group, and that's how Danielle Ibarra characterized it. What other evidence do we have of that? They're still switching members back and forth between crews. Both Barky Hawley, Alfonso Sosa, they're in one group. They switch to the other group. They're still working together and working together to do the same thing, to burglarize tire stores. The conspiracy never ended. It never ended as a result of that argument, and it never ended because they went to jail. Because the second they got out of jail, both times that Joel was arrested in this case, he gets out of jail, and he goes right back the first time to burglarizing tire stores, second time to threatening Mario Gonzalez on behalf of the organization. But what of counsel's argument that there could have just become two organizations? I mean, I get that there is maybe a question about whether there was withdrawal, but so there's a falling out. I'm thinking of Angelica Vargas. I mean, did she continue performing the same functions she performed before? Did she also continue paying, I guess, what was his name, Arthur Vargas' crews as well as Joel Vargas' crew members? I mean, in other words, is there any other evidence other than the falling out that there was this sort of amoeba-like division of one conspiracy into two in August of 2017? Kind of in two parts. Angelica Vargas' role was always the same. She would either act as a backup driver when they needed one, but more importantly, she was the one that would inventory what the take was on tires and then write out the checks for people. They were not physically... The problem I have in answering that question is at the time of the apprehension, they weren't physically there. So I can't answer that question directly in terms of they're not physically there. But they're still operating as a big group. In as much as in any organized crime case, you've got people doing different roles. Not everybody has to be at every location at any given time when something meaningful has happened. The only thing the government has to establish is that within the conspiracy, you do have a meaningful role. Yes, they had a meaningful role. But at that particular moment in time, they were not there. But that doesn't separate. That alone does not separate them from the conspiracy. And this is exactly what we argue to closing argument. This was closing argument. It's the defense saying that, the prosecution saying otherwise, and the jury deciding no. They were a group. They were a single conspiracy. Moving on to the... What was the evidence the government offered of where the Tyres and the charged burglaries have traveled? There's three main pieces of evidence. There's Michael Lopez testifying about his dealings with the Mexican and him trafficking those Tyres. Those Tyres being trafficked to Mexico. There's Barky Hawley. There's testimony that some of Joel's past buyers had Mexican connections. But the evidence was at best attenuated and half of it related to Arthur instead of Joel. Is that correct? I would disagree slightly in that. Not that they had buyers with Mexican connections. That the Tyres were going to Mexico. And I think that's an important distinction. If you're charging somebody with transporting Tyres into Mexico, it would have been rather simple to ask the witness if you had the evidence. Where were these Tyres bound for? What I'm looking for is something other than an inference that in the past you were chasing these people because they were moving these Tyres into Mexico. And then you come to a very specific indictment. And then the question has to do with whether or not the Tyres that you charged Joel with, there's evidence in the record that those Tyres were moved to Mexico. I'll give you if they moved to Mexico. This is a constructive argument I put to one side. I'm trying to sort out the evidence. Other than speculation that they had been doing this with Mexico in the past, you set up a bust and you go in. Is there direct evidence that they were bound from Mexico? You say that your evidence, I guess, is the negative implication that they didn't have any other market. Is that true? No, absolutely not. The majority of these Tyres, for example, Bill Hall who testified, he runs a large construction yard in the San Antonio area. They had a domestic operation. They had a large domestic operation as well. They had a number of people, particularly in the gravel yard industry. They were going to Mexico. A lot of those Tyres were flowing domestically. Well, where I would disagree with the Court slightly is this. When we talk about inferences, I don't believe this is an inference. If Michael Lopez asks an individual or is talking to an individual and he says these Tyres are going to Mexico, that's not it. He's not making an inference there. That's somebody telling him that's where these are going. And the same is true later with Barky Hawley when he's talking to Carlos. And Carlos is talking about these Tyres are going to Mexico. That's not really an inference. That's actually somebody saying that's what's going on here. That's not circumstantial evidence where you're kind of making a conjecture. The evidence that you have a seizure, I guess, and the question is whether or not those were bound for Mexico or for the domestic market. And I just was trying to locate evidence that that particular seizure, not what they've done in the past. They've got a conspiracy. They've been going and so forth, and they're hooked for that. But the problem is you have a domestic operation, and you run a seizure, and these are Tyres, and they're going to Mexico. Maybe they're not. In general, they import to Mexico, but in general, they also go domestically. So how do you – what's the proof about these shipments that are charged in the indictment? That's why in my brief on page 14, what I try to do there is I talk about intermingling, and I bring up the Styrone case. Because in that – both parties have cited that case. And what's going on there is in the Pennsylvania, West Virginia, Ohio area, you've got various sand mines where they're mining sand. And the sand goes to various places where they store sand, so now it's all intermingled. And then part of it illegally is being transferred across state lines in the case. Now, the Supreme Court later on said you brought in a steel theory as well, and because you brought in that theory, which you didn't indict, we're striking it because of the steel theory. But nothing – if the government had just stayed with its sand theory, we'd have been fine. And the sand in that case, just like here, where in this case, we've got various warehouses. And in one of the videos shown at trial, you can see tires just stacked up to the ceiling. And you've got at least three in terms of Bill Hall's residence. You've got the Mario Gonzalez's rental property, and you've got the Arthur Vargas's storage facility in his backyard. Tires from all these various burglaries are just being put. They're all intermingled. Just like sand, there's no identifying marker on a grain of sand. There's no identifying marker on a tire. A tire is a tire. But out of these, they all come in and then they're transported. The Third Circuit in that case basically indicated that it's not necessarily that this should be the progress of all sand. It's enough to say that evidence of a considerable quantity was sent to Ryder in this way. Out of these warehouses, tires are being trafficked to Mexico. In Barkey Hawley's testimony with Carlos, that's late in the conspiracy. These tires, some portion of which would have gone to Mexico as they're making their way through this organization and their paths of commerce and how they do business. But he was talking about Arthur Vargas, not Joel. The storage facilities were shared. I don't know that there was any difference in how the storage facilities regulated between the two. As of their argument, they've both put tires in these storage facilities, and there's no documentation of whose tire came from what. It's all together. Pause for a second, not to derail your question. Sorry, I'm not pushing it. I want you to ask a question, but I want to ask you a question that probably everybody up here on the bench knows the answer to but me. These are ginormous tractor-trailer tires, right? Okay. These are not passenger tires. These are ginormous tractor-trailer tires. The market is to these big trucks that roll down the road, et cetera, right? Correct. How in the world for 10 years you got thieves stealing those kind of tires? I mean, who doesn't lock them up or they're under surveillance or, I mean, I'm reading the briefs trying to figure out how does one surreptitiously steal these ginormous tires that have a limited, I mean, utility, et cetera, and it just happens over and over and over? You know, nobody knows it, et cetera, et cetera. I mean, it's kind of a—I'm trying to visualize the storage facility, et cetera, but to do this for 10 years on these kind when, you know, you can't just be on the corner selling these. So I know there's a simple answer, but I read the briefs and I never could figure it out. The simple answer is this is a professional operation. Joel recruited these people, and he trained them like a military unit. When they go in, they come up—they've got U-Haul trucks that they— Stay on your mic. No, just stay on the mic. Okay, that they know will carry I believe it was 139 tires. They've got the U-Haul down to how many they can pack. They drive their back up. They cut the chain link fence. They go in. They don't go through doors because it's too complicated. They cut through the metal wall. Then they leave, wait for cops to come. They don't see anyone when they shine the light. They leave. They then come back an hour later. They then go in. They disable the security units and the power grid within the building. Then they take and roll all masked up in camouflaged clothing. Then they roll out the tires, stack them in a very organized fashion in their U-Haul, and they're out, and they're in and out like that. It is a professional operation. Surveillance from at least I think three of these operations was shown at trial. Very professional operation. That's how they were able— And in addition, you don't do it in your own backyard. That's why these cases are all across Texas because then when the local cop detective tries to investigate the case, he hasn't buyers in the area. He's got no leads because these tires are now 500 miles away in San Antonio. That's how they were able to do so many stores for so long without getting caught. All right, thank you. That's helpful. Like I said, I figured maybe everybody else understood that. So this is like paramilitary style. It was a very— This is made for TV. Yes, yes. You can make a movie about this. Jack Reacher or somebody or the NCIS. Okay, I'm just visualizing. But no, you helped me because you said the jury was shown the film. I mean that just helps me again back to this whole sufficiency piece and what the jury was able to perceive in terms of the interlocking and your arguments, Jerome, in terms of intermingling for the jury to be able to clearly get it. Like I said, we love jury trials. They're few and far between. So I'm assuming the government put it all— Y'all didn't bring one of them big tires in the courtroom, did you? No, we didn't do that. But then from there, it goes to a variety of warehouses that they have, and then they've got a variety of trucking companies that they deal with that love to buy tires for pennies on the market because that's a huge expense for them. One more question for me, maybe, and then back to Judge Wilson. But back to the Angelica Vargas. Okay, you said, I believe, her role never changed. She was writing the checks, doing whatever. So the jury heard evidence of her notwithstanding whatever, the falling out, that there's this linear connection that she's still notwithstanding what she's arguing in the brief. Is that— Yes, and she even testified. Oh, she testified? She testified in trial, yes. All right, because I hadn't read the whole record. I mean, I just read snippets of it. All right. And she denied all of this. What did she say in essence? I wasn't there. I didn't do it. They got me mixed up with somebody else? Yes. Or—huh? Yes, until it was posed to her how many times she had bailed her husband out of jail for this, and she had to concede numerous times, and then she conceded on the witness stand that she was aware that he stole tires. Well, it's surprising that we have no indictments for receiving stolen property. With the tires this size, they're usable only in major units, and there are major buyers domestically out there picking up these tires. I mean, this is not somebody buying some consumable product and putting it in their pocket kind of thing. These are for over-the-road travel, and you have a large domestic market, and you never touch the domestic market. That is, the buyers in this, it's difficult for me to see how someone can not figure that something's wrong when they get such a heavy discount on the very expensive tires. In all fairness, I think it's willful blindness, but, you know, that's just me speculating. Well, that's what just struck me is an awful lot of domestic willful blindness, and I'm not being critical of the operation. It was a very clever operation to do what you did because of the difficulty of tracing the tires. I appreciate that, but it just puzzled me that the only thing that went down was you've got these particular people, and you try to source, but you've got a lot of people out there wanting to buy those cheap tires. Yeah, absolutely, concrete yards, shipping companies, gravel yards. So, yes. Mr. Anderson, I may have derailed you from answering a line that Judge Wilson was asking, and I apologize for that. So you may not have finished answering this question. He may not have finished answering it, and I apologize to him. So I apologize. Could you please restate the question? Thanks, Judge Stewart. I was just basically building on what Judge Higginbotham was asking, which I'm still grappling with the sufficiency of the evidence that shows that these tires went to Mexico because you don't have interstate commerce, right? The whole thing really hinges on tires going from Texas crossing the border into Mexico, and so you've got this testimony from 2012-2013 time frame. Yes, we had Mexican contacts, and I think the tires went to Mexico. So that's four years before this, and then we have testimony that's more contemporaneous, but it relates to Arthur Vargas's jobs, not specifically to Joel's jobs. So I just want to probe that a little bit more because, I mean, it strikes me that the evidence is pretty weak. Is it enough for the jury to have found beyond a reasonable doubt that tires crossed the border that were involved in jobs Joel did? I don't know that Barky Holley at the time that he's talking about, that might have even been before the split. And even after the split, Barky Holley is working for both crews. So I don't know that we can parse that honestly and say that that's only in relation to tires that Vargas is after the split. I was going to ask if his testimony related to post-split or pre-split and whether that matters. I'm not in agreement that there was a split. At no point have I agreed that there was an argument and they began doing burglaries separately. Now, I'll concede that if we're going to call that a split, I will, but I just want to make it clear that I'm not conceding that the organization split. If the organization didn't split, is the evidence then sufficient whether it relates to Arthur or Joel that the tires crossed the border? Absolutely. If this is one conspiracy, and I just want to address one other thing that I think is really germane to this. When you were talking about withdrawal, there's a clear reason why that was never asked for. If you look at the language, that would have been fantastic language for the government to argue they didn't do any of these things. There's no way the defense would have asked for the withdrawal instruction. That would have not been in their best interest in this case. I understand the tactic. All right. Thank you. All right. Thank you, Mr. Chief. Thank you, Your Honor. I appreciate it. All right. Back to you, Ms. O'Rourke, for rebuttal. If it lies within the province of a court to change the charging part of an indictment to suit its own notion of what it ought to have been or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance of the common law that the common law attaches to an indictment by grand jury— What are you reading from? This is from Sterone, quoting Ex parte Bain. The great importance which the common law attaches to an indictment by grand jury— You and the government are relying on Sterone, right? I mean, you both cited in your brief, right? Yes. Okay. Yes. And as was mentioned by the government, anyone could see in the indictment that they were talking about, in counts one and two, transporting tires from Texas to Mexico, just foreign commerce. But, again, the jury was told that they could convict based on interstate or foreign commerce. Counsel, they really couldn't have convicted on interstate commerce, could they, because there was no evidence of interstate commerce? The only evidence of interstate commerce was the sting operation deliberately done with Art Vargas to go from Louisiana to Texas. But that's count three, not counts one and two. Correct. In other words, counts one and two, the only lane the jury could have followed— and I understand there's a question about the sufficiency of that evidence— but the only lane they could have followed was across the border with Mexico. So how is the indictment's language— I mean, how is the difference between the indictment and the charging instruction not a variance as opposed to an amendment? In other words, the jury really— It's not a variance because those are separate bases of jurisdiction. But the jury really couldn't have gotten off course here, could they? I think it was quite confusing, and I think that they could have, but because there was an attempt to bring in evidence about the Louisiana-Texas— What are you basing it on? Did the jury send a question out on that? I mean, when you say— Well, we don't know. They had the option of— I'm saying did they send a question out confused about this? We don't know what they thought. We're left with that option, and there is a case— Now listen to my question. Listen to the question I'm asking, not the one you want me to ask, okay? I'm saying during the trial, it's a dynamic element. Jury's confused, has a question, whatever. They write it on a piece of paper, they send it out. Judge confers with counsel and says, jury has a question about X. I am asking you, when I read this record, will I find that they asked any question about the matter about which you say they were confused? I'm not saying that they were confused. I'm saying that they were given an option. Yes or no. When I read this record, will I find? No. Thank you, counsel. That's all. I'm not trying to paint you in a question. It's just like once you say the jury was confused, then jury's confused. They write a—they send a note out. Then you'd be able to say, well, they were obviously confused because they asked this note. I disagree with what the judge said, but now if they didn't do that, then it's just argument to say the jury's confused. That's all I'm trying to be clear on because we're going to read the record. Right? Right. I mean, you're able counsel. You're doing good. This will segue me into saying, Ms. Oler, you are CJA counsel. This panel, this whole court appreciates immeasurably the work that you do and all the other CJA counsel that we have to take appointments in these cases. You didn't try them. You take the records as you find them. You have to make able arguments on behalf of your clients, and you have to answer questions you wish weren't asked, but you do it with a smile, and you're straight A counsel. So I want you to know, and my same comment will go to Mr. Ross when he does this, but we do appreciate your taking the case. Thank you. All right.  Thank you, Your Honor. And just very briefly, I want to hit on one of the questions that I believe Judge Wilson brought up to the government in regards to Angelica Vargas as far as what was her role. Did she continue to do the same thing? And I think that I don't want to leave the court with the impression that Angelica Vargas, after the split, when she was with Joel, she continued to pay Joel's crew. There's no evidence that she was paying— She testified on the stand that she said what you're saying, that she quit, that she didn't write it, whatever, whatever. I didn't focus initially on the fact she testified. So, I mean, did she say to the jury, but you're urging us, I withdrew, or maybe I was a part, but maybe I'm not, or I was never a part of whatever. So when we read her testimony, is that going to be congruent with the argument you're making to us? I don't believe that you're going to read that specific testimony from her, Your Honor. I think it's more of I didn't know what was going on, but then it comes to a point of when you look at the evidence in the case, the evidence is going to show that— But her testimony is evidence. I'm sure that there was riveting cross-examination. The prosecutor probably couldn't wait to get out of his or her chair when she hit the stand to just kind of go back, just kind of literally she glued to that chair. And so I'm just saying in the elicitation of that, when we read this testimony, is her testimony going to be supportive of the able argument that you're making in terms of her role or not? That's all I'm asking. Not really. I don't believe it really will, Your Honor. However, I would just point to the fact that she also came into this later. I mean she's the second wife of Joel, and when you see that when she was involved, all she is knowing is the end state. She wrote all the checks and all this stuff. Now, counsel, come on. Well, the checks were just for the burglaries and covering— Groceries? No, no, no. Your Honor, the evidence is clear. I'm not being facetious. I'm just trying to say on the one hand if she's writing checks and doing this to say that she's blind to all that's going on, it's taking a little bit for her, right? Right, but if I may, just real briefly, I think the critical point in that is this, is that all that she knew was things – was going on in the state of Texas, not interstate. And so it should be a state case as to her, but the only reason it gets federal is because of the Louisiana reverse sting operation with Arthur's group after the argument, after the split that she had no knowledge of. She had no knowledge of that. Then the issue becomes did she have an agreement to participate in that? So that's our argument, Your Honor. All right. Well, that's able. All right, Mr. Ross. Certainly, what I said to Ms. Sola, likewise, we appreciate you as CJA counsel taking these cases and ably coming, especially to come in and get to argue too. It's helpful to illuminate the case. So thank you both for your service. Thank you, Judge. All right. Thank you, Mr. Anderson. Appreciate presentation from the government. The case will be submitted. We'll figure it out. We'll let you know. All right. Second case up. Number 20-30422, United States of America versus Goodrich.